CARTER v. SEABOARD AIR LINE RY. CO.

(District Court, E. D. Virginia. January 24, 1907.)

COLLISION—TUG WITH TOW AND SMALL BOAT—NEGLIGENT NAVIGATION IN HARBOR.

> A collision in the harbor of Norfolk, Va., in the daytime between a batteau rowed by two persons and a barge in tow on the side of a tug, in which one of the persons in the batteau was drowned, *held* to have resulted from the combined fault of those in charge of both vessels, those in the batteau for failing to give proper care and attention to the movements of other vessels in the harbor, and those in the tug in proceeding at too high a speed, unnecessarily close to the ends of the piers, and in failing to keep an efficient lookout.

In Admiralty. Suit to recover for loss of life in collision.

Riddleberger & Roper, for libelant.

Goodrich Hatton, for respondent.

WADDILL, District Judge.  On the 7th of July, 1906, about 4:15 o'clock in the evening, Sam Carter, son of Jefferson Carter, a young man 19 years of age, while passing up the Elizabeth river in a batteau, which was being rowed by him with one oar, and sculled by a companion, Isaac Austin, a boy about 16 years of age, was drowned as the result of a collision between the batteau and one of the defendant company's house barges used in and about the harbor of Norfolk for the

transporting of its freight, in tow of respondent's tug Dorothea. The accident occurred between the Merchants' & Miners' Pier and that of the Old Bay Line, in the Elizabeth river, as the boys were proceeding up the river from the vessel to which they belonged, anchored on the Atlantic City flats, to the Roanoke Dock; and the tug and tow were proceeding from Southgate's Wharf, immediately above the Old Bay Line Wharf, down to the New York, Philadelphia & Norfolk Railroad Company's pier, immediately below the Merchants' & Miners' Wharf, to discharge freight at the latter place. The batteau in question was a small flat-bottomed boat, with a pointed bow and square at the stern, and of nearly triangular shape, some 18 feet in length, used as an oyster boat, capable of carrying some 48 bushels of oysters. The Dorothea was a steam tug of some 79 tons gross. The tug's tow consisted of a house barge about 100 feet in length and 40 feet in width; the house being some eight feet above the deck, and at the time of the collision tied on the port side of the tug, her stern about 20 feet aft of the barge's bow.

The libelant insists that the tug and tow was navigating in too close proximity to the piers in the harbor, and proceeding at an excessive rate of speed for such service, and that the tug and barge were each without a lookout, or sufficient lookout, at the time of the occurrence, and, in addition, at the moment of the collision that the tow swerved from its course, running still closer into the shore, and negligently and carelessly ran into and over the batteau. The respondent, on the other hand, says that the accident was the result of the negligent navigation of the batteau along the front of the piers in the river, without taking proper care and precaution to observe the movements of other vessels in the locality, and especially that the same was caused by reason of those in charge of the navigation carelessly and recklessly rowing the batteau from and behind the Merchants' & Miners' Pier and a barge tied thereto, and crossing the course of the approaching barge and tug at a time that it was too late for them to avoid the collision. A large number of witnesses were examined before the court upon the issues thus joined between the parties, and no good will be attained by a general discussion of the testimony further than to say that the same has been fully and carefully considered, and that the conflict as to many of the material facts is irreconcilable. The conclusion reached by the court upon the whole case is that the collision came about, and could not well have happened except, from the combined negligence of those in charge of the batteau and the navigators of the tug and tow.

The evidence in the estimation of the court does not sustain the respondent's contention that the batteau suddenly emerged from behind the barge lying at the Merchants' & Miners' Pier, which extended as claimed by them out beyond the pier. It does, however, show that the two boys in charge of the batteau were negligently navigating the same, in that they were not taking proper care and caution to look out for and observe the approach of other vessels lawfully in the harbor. It also clearly appears that the tug and tow on the same occasion were guilty of negligence which directly contributed to the accident, in that they were proceeding in too close proximity to the piers and vessels

lying thereat at the speed they were then going, and that they were navigating without any, or, if any, certainly without a sufficient lookout at the time. No claim is made that either the tug or barge had any person whose special duty it was to act as lookout. At the time of the accident only the master, mate, and deck hand were on deck engaged in navigating the tug and barge—the master at the wheel, and the mate and deck hand engaged one in getting in the forward line, and the other the after line, after leaving Southgate's Wharf. The only pretense of a lookout was that a freight or tally clerk upon the barge, whose business it was to receive and discharge the freight and keep proper record thereof, acted as such. The master of the tug says he asked this clerk to act as lookout while passing from one wharf to the other, and the clerk claims that he did so act, and says that upon the Dorothea's casting off her lines and straightening out for the change of wharves he left the middle of the barge and took his position upon the forward deck or apron in front of the house, with the view of acting as lookout, but that he never saw the batteau until it came out from behind the barge lying at the Merchants' & Miners' Wharf, some 15 or 20 feet away from him. No other witness seems to have seen him on the forward end of the barge, on the apron or in front of the house, though large numbers of them were examined, who were in a position easily to have seen him, except the captain of the tug boat, who says that from his pilot house on the tug he could see through a side door of the barge out to its front, and that he saw the clerk there. The overwhelming preponderance of the evidence is to the effect, assuming this clerk to have been a suitable lookout at all, that he was not on the forward end or apron of the barge, certainly in time to have averted the accident, and the evidence likewise strongly tends to show that that was not the best and usual place on barges of that character for him to have been located as lookout, because of his inability to promptly see and communicate with the navigator on the tug. The court's view of the evidence in this respect is, and it reconciles much of the conflict as to the presence of the lookout, that he came to the front, having likely been detained by his other duties for a moment on leaving Southgate's Wharf, at a time when it was too late to see and observe the batteau, and therefore avoid the collision. The distance was very short from Southgate's Wharf to that of the New York, Phildelphia & Norfolk, some 800 feet, and the collision took place certainly not over half of the distance on the trip, and the slightest delay in going to the front would account for his not seeing the batteau sooner. Certain it is, if he had been in front as he claims, he could and would have seen the batteau, and could easily have avoided the collision. It was the duty of the tug, she being in a position not to observe and see objects ahead of her tow, at least to have a person competent in all respects placed in the best possible position to see, to the end that the movements of the tug could be promptly controlled while navigating the harbor. Confessedly no lookout was on the bow of the tug, and but scant precaution, if any, was taken to have any one properly stationed as lookout in connection either with the tug or tow. City of Philadelphia v. Gavagnin, 62 Fed. 617, 619, 10 C. C. A. 552. The duty to keep a look-

out is a positive one, and must be discharged, and no chances taken in respect to the same, and this is especially true where those in charge of the tug's navigation are engaged in the movements of vessels such as this house barge, which is larger than the tug, and obstructs her view from objects ahead.

The respondent's contention is that at the time of the accident they were navigating within 15 or 20 feet from the end of the barge lying at the Merchants' & Miners' Pier. This likewise in the judgment of the court was negligence, having regard to the speed they were going, admitted to be about 2½ knots an hour, with the then conditions prevailing in the harbor. There was no reason why the tug and tow should not have kept at a greater distance from the piers, as there was ample room in the harbor, and no weather or other conditions making it necessary for them to keep so close in shore. The Relief, Fed. Cas. No. 11,693; The Sampson, Fed. Cas. No. 12,280; Greenman et al. v. Str. Narragansett, 4 Fed. (D. C.) 244, 256; The Owego, 71 Fed. (D. C.) 537, 542. Whether the tug and tow swerved out of their course in shore, at and about the time of the accident, is immaterial, though the evidence strongly tends to support libelant's contention in this respect, in view of the fact that it was about the time to make a change of course to get to the pier to which she was proceeding.

It follows from what has been said that the collision occurred as the result of the combined negligence of those navigating the batteau and the tug and tow, and for the loss arising therefrom the damage should be divided between the libelant and respondent. The Job T. Wilson (D. C.) 84 Fed. 207. This brings us to the question of the amount to be awarded, and in this case, as is usual, it is not free from difficulty. The deceased was 19 years old, earned between $25 and $30 per month, was of good habits and character, and evidently a worthy and respectable young colored man, and for whose loss of life the sum of $3,000 would seem to be just and reasonable, and a decree, therefore, may be entered against the respondent for one-half of that sum.